J-S07020-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JOUSE KARIEL ORTIZ SERRANO :
:
Appellant : No. 924 MDA 2025

Appeal from the Judgment of Sentence Entered November 27, 2024
In the Court of Common Pleas of Lebanon County Criminal Division at
No(s): CP-38-CR-0000407-2022

BEFORE: BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.: **FILED: APRIL 8, 2026**

Appellant, Jouse Kariel Ortiz Serrano, appeals from the judgment of sentence entered on November 27, 2024, as made final by the denial of Appellant's post-sentence motion by operation of law on May 8, 2025. We affirm.

The trial court ably summarized the underlying facts and procedural posture of this case:

> On February 23, 2022, John Carlos Alvarado-Rosado [(hereinafter "the Victim")] was found unconscious and gasping for breath along North Eighth Street in the City of Lebanon. He died soon thereafter. A subsequent autopsy determined that [the Victim] had been shot multiple times and that he suffered blunt force trauma as well.
>
> Criminal charges for homicide were filed against [Appellant] on February 25, 2022. . . . [On July 21, 2023, Appellant] entered an open plea to criminal homicide with the understanding that degree of guilt would be determined by a jury.

. . .

A degree of guilt trial was conducted on September 24, 2024, through September 26, 2024. Twenty-two [] witnesses were presented by both sides.  . . . [The following is a summary of the notable testimony:]

(1) Francis Pennington

Mr. Pennington resided [on] North 8th Street. On February 23, 2022, Mr. Pennington indicated that he heard "multiple gunshots". After police arrived, Pennington left his house and observed [the Victim] lying on a sidewalk near his house. Pennington advised police that his home was equipped with a video and audio security system. He provided police with a copy of the surveillance tape. The tape was played for the jury.

(2) Jennifer Boyer

Ms. Boyer [also] resided [on] North 8th Street. She also heard multiple gunshots. She looked outside her house and saw an individual limping toward the railroad tracks. She exited her house and observed the man fall down in front of a church on North 8th Street.

(3) Lieutenant Sean Buck

Upon arrival at the North 8th Street scene, Lt. Buck encountered a man gasping for breath along 8th Street. He observed signs of trauma. When the [Victim] was rolled to facilitate medical treatment, Lt. Buck saw pieces of a handgun and magazine located under the [Victim].

(4) Dr. Crystal Magno

Dr. Magno is a forensic pathologist who conducted the autopsy of the [Victim]. Dr. Magno stated that the [Victim] died as a result of multiple gunshot wounds. Dr. Magno discovered [12] gunshot wounds on the [Victim's] body. She testified that three [] of these wounds were fatal. In addition, Dr. Magno described signs of blunt force trauma that were not fatal.

(5) Detective William Walton

Det. Walton gathered together videotapes from the home of Francis Pennington and from the Lebanon Middle School that was located directly across the street from the shooting. The videotapes were played for the jury. The Lebanon Middle School tape clearly showed the [Victim] being shot multiple times by a man wearing a black mask. The [Victim] was able to continue walking despite his wounds. [Appellant] followed the [Victim] as he was walking south on the sidewalk abutting North 8th Street. Additional shots were fired. Ultimately, the [Victim] was seen falling to the ground. [Appellant] then pummeled the [Victim] as he was dying along North 8th Street.

Det. Walton also testified about a shooting that involved [Appellant's] father approximately [two] months prior to the date of the homicide. Det. Walton testified that the shooting of [Appellant's] father was still under investigation as of February 23, 2022. Det. Walton said that [Appellant's] father would not report who the shooter was. Det. Walton also interviewed [Appellant] about his father's shooting. [Appellant] similarly refused to provide Det. Walton with any pertinent information.

(6) Richard Schofield

Richard Schofield was involved in drug trafficking with [Appellant's] father. He was aware that [Appellant's] father was shot in his own apartment in December of 2021. He was told "on the streets" that the shooting was committed by "Daniel" (later identified as the [Victim]). Schofield had several discussions with [Appellant], who likewise believed that the [Victim] was the perpetrator of his father's shooting.

According to Schofield, he and [Appellant] went to visit [Appellant's] father in the Hershey Medical Center. The father was asked whether Daniel had committed the shooting. Schofield stated that the father nodded his head to reflect an affirmative response. [Appellant] asked his father, "Do you want this dealt with?" The father again nodded his head in an affirmative response. Following the hospital visit, [Appellant]

told Schofield that he wanted to be involved in a scheme of retribution.

[Appellant's] father authorized withdrawal of $1,000 from his bank account to cover "expenses" pertaining to the retribution. [Appellant] and/or Schofield went to the bank and withdrew $600. Schofield discovered that a man known as "Gordo" was willing to sell a gun. Schofield than went to speak with Gordo and was told that an unknown individual had a gun for sale and was asking $300 for the gun. The next day, Gordo facilitated the sale of a 9mm Taurus handgun with an extended 39-round magazine. Using money given to him by [Appellant's] father, Schofield purchased the gun and additional ammunition from Dunham's Sporting Goods store. Schofield then took [Appellant] to test fire the gun in a remote area of Lebanon County. Both Schofield and [Appellant] undertook target practice using the gun.

Schofield testified that he and [Appellant] searched throughout Lebanon for Daniel. They looked for a gold Honda Accord vehicle linked to Daniel. At one point, they found the vehicle and surveilled the home it was near for several hours before leaving. As the above was occurring, Schofield testified that [Appellant's] father changed his mind about retribution. Apparently, the father stated to [Appellant], "Let it go". At some point after the gun was purchased, Schofield was incarcerated. From prison, Schofield wrote [Appellant] a letter and advised that he should "fallback". It was while Schofield was in prison that he heard about the shooting of Daniel.

Several days after the shooting, [Appellant] was also placed in the Lebanon County Prison. He was assigned a cell in the same block as Schofield. While together in prison, the two men spoke about the shooting. [Appellant] stated that he had caught up with Daniel and that he shot him 9-10 times. He reported that Daniel did not go down immediately, so [Appellant] shot him yet again as Daniel was walking away. [Appellant] also told Schofield: "They will never find the gun."

(7) Geraldine Segarra-Vasquez

Ms. Segarra-Vasquez was the girlfriend of [Appellant] during 2022. They lived together in an apartment on Lehman Street

roughly one-quarter of a mile from the Lebanon Middle School. Segarra-Vasquez stated that [Appellant] was angry at Daniel as a result of the shooting of his father. [Appellant] threatened that he would kill Daniel. However, Segarra-Vasquez stated that she did not take his threats against Daniel seriously.

Segarra-Vasquez stated that [Appellant] purchased a gun "on the streets". The gun was kept inside the couple's apartment. On February 23, 2022, [Appellant] and Segarra-Vasquez were walking to a store located on Lehman Street between [Appellant's] apartment and the Lebanon Middle School. [Appellant] saw Daniel. He then ran back to the apartment. When Segarra-Vasquez arrived at the apartment shortly thereafter, [Appellant] had placed a mask over his head. He then left.

At an undisclosed time thereafter, [Appellant] returned to the apartment. He had blood on his hands. His gun appeared to be broken. [Appellant] stated to Segarra-Vasquez: "I killed him."

(8) Detective David Shaffer

Det. Shaffer is trained in analyzing the contents of cellular telephones. He effectuated a download of information on the cellular telephone belonging to [Appellant]. Det. Walton testified that news articles regarding the shooting were contained on [Appellant's] phone, as was a video depicting [Appellant] wearing a black mask similar to the one worn by the [Victim's] assailant.

(9) Detective Ryan Mong

Det. Mong was part of a team surveilling [Appellant's] apartment two (2) days after the homicide. When Det. Mong attempted to effectuate an arrest warrant, he stated that [Appellant] tried to sneak out the back door.

(10) Corporal David Turnbow

Cpl. Turnbow is employed by the Pennsylvania State Police Crime Laboratory as a forensic firearms specialist. He reviewed the [14] bullets and [20] cartridges that were

- 5 -

retrieved from the scene of the homicide. He stated that all were discharged from the same gun and that the gun was a 9mm handgun.

. . .

[Appellant's defense focused upon a claim of diminished capacity]. Several witnesses provided testimony relevant to this issue:

(1) Dr. John Markey

Dr. Markey is a forensic psychologist hired by the defense. He met twice with [Appellant] and administered several psychological tests. Dr. Markey testified that [Appellant] reported finding his father inside his apartment almost dead. He stated that the episode caused [Appellant] to suffer nightmares and "re-experience the traumatic event." He stated that [Appellant] became hyper-vigilant and suspicious of others. He reported that others in the community told [Appellant], "You could be next." All of this combined to cause [Appellant] to believe that he had to find and kill the [Victim] in order to defend himself.

Dr. Markey stated that [Appellant] reported that when he saw the victim at a store, he became scared. Everything that occurred thereafter was undertaken in self-preservation. Dr. Markey testified that he believed the [Appellant] suffered from [post-traumatic stress disorder ("PTSD")] and that he was incapable of developing specific intent to kill as a result.

(2) Kathy Serrano

Ms. Serrano is [Appellant's] mother. She acknowledged that she kicked [Appellant] out of her home when he dropped out of school and began using [marijuana]. At this point, [Appellant] moved in with his father. Ms. Serrano stated that her son was "destroyed" when his father was shot. She described [Appellant] as "completely changed" after the shooting. She claimed that he could not eat or sleep normally.

(3) [Appellant]

- 6 -

[Appellant] took the witness stand in his own defense. He focused upon his "perfect" and "inseparable" relationship with his father. He spoke about how much he was traumatized by his father's shooting. He also complained that his father never recovered from the two bullets that were lodged inside his brain. After his father's shooting, most communication was undertaken between the two using paper and napkins.

[Appellant] acknowledged that he purchased a gun, but said it was for "protection". According to [Appellant], his encounter with the [Victim] at a store on Lehman Street sparked immediate fear. He testified: "I was living in a different reality." He immediately returned to his apartment to retrieve a gun and he stated he was "most definitely" afraid. He stated: "If this guy lives, I am dead."

(4) Joanna Katherman

Joanna Katherman is a mental health clinician who works at the Lebanon County Correctional Facility. She has 40 hours of PTSD training and completes risk assessments. Upon intake, Ms. Katherman performed an evaluation of [Appellant]. She did not detect any signs of PTSD and saw no need for treatment.

(5) Madelyn Sweatlock

Madelyn Sweatlock performed an intake interview of [Appellant] at the Lebanon County Prison. She described [Appellant] as calm. He denied nightmares, feeling jumpy or feeling anxious. Interestingly, near the end of the 20-25 minute intake interview, [Appellant] asked for Ms. Sweatlock's telephone number.

(6) Dr. Clarence Watson

Dr. Watson is a forensic psychiatrist who was hired by the Commonwealth. Although Dr. Watson did not meet directly with [Appellant], he did review copious information. Given everything presented, Dr. Watson opined that [Appellant] could have developed specific intent to kill.

. . .

- 7 -

At the conclusion of trial, the jury rendered a verdict of guilty of first degree [murder]. Sentencing was scheduled for November 27, 2024.

During the sentencing proceeding, [Appellant's counsel] reported that she had been inside the stall of one of the women's restrooms in the Lebanon County Courthouse toward the end of the trial. She stated that two women entered the bathroom and began talking about the trial. She inferred from the conversation that the women were jurors. [Appellant's counsel] apologized for not reporting this sooner, but she requested a new trial based upon what she reported. [The trial court] denied [Appellant's counsel's] motion. In doing so, [the trial court] pointed out that had [Appellant's counsel] reported the issue promptly, [the trial court] would have been in a position to interview female jurors in order to ascertain whether they were in fact in the same bathroom as [Appellant's counsel. The trial court] then proceeded to sentencing. As required by statute, [the trial court] imposed a sentence of life in prison without any possibility for parole.

Trial Court Opinion, 5/16/25, at 1-17 (some capitalization omitted).

Following the denial of Appellant's post-sentence motion by operation of law, Appellant filed a timely notice of appeal.[1] Appellant raises 11 claims on appeal:

_____

[1] Appellant's timely post-sentence motion was denied by operation of law on May 8, 2025. However, the order denying Appellant's post-sentence motion was not entered until May 16, 2025. This failure constitutes a breakdown in the processes of the court. *See Commonwealth v. Khalil*, 806 A.2d 415, 420 (Pa. Super. 2002). Therefore, Appellant had 30 days from the date the order was entered, *i.e.* May 16, 2025, in which to file a timely notice of appeal. *Id.*; Pa.R.Crim.P. 720 cmt. ("[w]hen a defendant files a timely post-sentence motion, the 30-day period for the defendant's direct appeal on all matters in that case . . . is triggered by . . . the denial of the motion by operation of law" and the appeal period runs from the date of entry of the order as established by Pa.R.A.P. 108); *see* Pa.R.A.P. 108(a)(1) ("in computing any period of time under these rules involving the date of entry of an order by a court or other government unit, the day of entry shall be the day the clerk of the court or

*(Footnote Continued Next Page)*

A. Was the evidence sufficient to sustain a verdict of first degree murder such that that the denial of [Appellant's] motion for judgment of acquittal was proper?

B. Did the trial court abuse its discretion by failing to grant [Appellant's] request for judgment of acquittal based on the argument that the verdict of first-degree murder was against the weight of the evidence, such that it would, "shock the conscience" and therefore should have resulted in [Appellant's] request being granted?

C. Was it proper for the [trial court] to permit the testimony of the Commonwealth's witness, Richard Schofield, when it was available to the Commonwealth for months or even at the time of the initial investigation which would have been years, prior to the degree of guilt trial, creating an unfair surprise thus preventing Appellant from getting a fair trial?

D. Did the trial court err when it failed to grant a mistrial based on the *Brady* violation that occurred when the Commonwealth failed to disclose evidence of the existence of a knife, that was located by an EMS worker, on the [Victim] at the time of the shooting which could have supported [Appellant's] claim of voluntary manslaughter?

E. Did the trial court err in permitting the Commonwealth to present testimony of its witness, Richard Schofield, when it was clear that they failed to disclose a plea agreement offered to Mr. Schofield, and further potentially contributed to suborned perjury?

F. Did the trial court err when it permitted the Commonwealth to play a recording of the audio of the shooting, and then specifically the physical attack on the [Victim], with an enhanced volume, at the time of the Commonwealth's closing

---

the office of the government unit mails or delivers copies of the order to the parties"); *see also* Pa.R.A.P. 903(a) (notice of appeal must be filed within 30 days after the entry of the order from which the appeal is taken). Appellant then filed a timely notice of appeal on Monday, June 16, 2025.

argument, causing potential prejudicial emotional responses by the jurors just prior to dismissal for deliberations?

G. Should the trial court have granted a mistrial, due to the prosecutorial misconduct alleged, in that the [Commonwealth] served both of Appellant's parents with subpoenas to testify for the Commonwealth, fully aware that they were not going to have either of them testify, and thus prevented Appellant from getting the courtroom support of his family and preventing him from getting a fair trial?

H. Did the trial court err when [it] instructed the jury as to how to read the verdict slip, emphasizing starting with first degree murder and ending there if the jury found Appellant guilty of that charge?

I. Should the trial court have granted a mistrial when prior to sentencing he was informed by defense counsel that female jurors were in the ladies' room discussing the testimony of the Commonwealth's expert witness, in violation of the [trial court's] instruction not to discuss the case until all of the evidence was submitted and jury instructions were given?

J. Did the trial court err by failing to give an instruction on voluntary intoxication as a diminished capacity defense to first degree murder, when evidence was presented that Appellant was using illegal controlled substances at the time of the offense?

K. Did the [trial court] err by sentencing Appellant to life without the possibility of parole (LWOP) pursuant to Pa. Title 42 Sec. 9711, when said statute was unconstitutional pursuant to both the Eighth Amendment to the United States Constitution and Article I, Sec. 13 of the Pennsylvania Constitution?

Appellant's Brief at 11-15 (cleaned up; some capitalization omitted).

We have reviewed the briefs of the parties, the relevant law, the certified record, and the opinions of the able trial court judge, the Honorable Bradford H. Charles. We conclude that Appellant is not entitled to relief in this case,

- 10 -

for the reasons expressed in Judge Charles' well-reasoned opinions, which were filed on May 16 and August 15, 2025. Therefore, we affirm on the basis of Judge Charles' able opinions and adopt them as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Charles' May 16 and August 15, 2025 opinions.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/08/2026